Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

**Additional Pages for Initial Complaint**

I.  **The Amount in Controversy**
  A.  Unpaid Wages Due to Breach of Employment Contract
  B.  Role: Senior IT Project Manager – 60927BR, Grade 58 (Exempt)
  C.  Contract Term: March 20, 2023 – March 20, 2025 (possibility of reappointment)
  D.  Salary:
    o  Bi-weekly rate: $4,615.38
    o  Annual equivalent: $120,000
    o  One-time sign-on bonus: $2,000 (gross)
  E.  Termination Date: July 12, 2023
  F.  Total Amount Contested: $401,531.86
  G.  Breakdown of Compensation
  H.  Total Salary for Expected Contract Period: $480,000.32
  I.  Earnings until Termination (March 20 – July 12, 2023): $78,468.46
  J.  Unpaid Salary (July 12, 2023 – March 20, 2025): **$401,531.86**

II.  **Additional Damages Due to Breach of Employment Contract**
  A.  Beyond unpaid wages, additional components of the compensation package have been affected:
  B.  Compensation Package Breakdown
    1.  Liquidated Damages for Unemployment: $25,000.00
    2.  Unemployment Period without Benefits: $15,000.00
    3.  Retroactive Medical Coverage: $15,000.00
    4.  Short-Term Disability Coverage: $4,500.00
    5.  Continuing Education Support (PhD Allowance): $35,000.00
    6.  Retroactive Pension Plan Savings: $8,000.00
    7.  Retroactive Matching Allowance for Retirement: $0.00 (To be calculated)
    8.  Eligibility for Administrative Fellowship Program (AFP): $60,000.00
  C.  Total Additional Compensation Claimed: **$162,500.00**

1

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

### III.   Exceptions to At-Will Employment Rules in Massachusetts

Although Massachusetts is an at-will employment state, the following exceptions apply

- **A. Illegal Reasons for Termination**
  1. Employers cannot terminate employees for discriminatory or retaliatory reasons.
  2. *Case Reference:* Gonzalez vs. President and Fellows of Harvard College
  3. Basis for EEOC Claim:
     - a) Workplace discrimination and harassment (Afro-Caribbean hair accessory, demand for makeup, request for accommodation)
     - b) Post-Termination Retaliation:
     - c) Delay of approval for unemployment benefits
     - d) Delay in employment verification using agreed Harvard Business School reference for a new job

- **B. Implied Contract Exception**
  1. Even in at-will states, an implied contract may exist through employer actions.
  2. *Case Reference:* Gonzalez vs.President and Fellows of Harvard College
  3. Reasoning:
     - a) Signed employment agreement had a start and end date (March 20, 2023 – March 20, 2025)
     - b) No clause indicating at-will employment
     - c) Reasonable assumption that employment was contractual

- **C. Public Policy Exception**
  1. Employers cannot terminate an employee for exercising a legal right or refusing illegal actions.
  2. *Case Reference:* Gonzalez vs. President and Fellows of Harvard College
  3. Application:
     - a) Exercised First Amendment right by supporting the Supreme Court decision against Harvard
     - b) Expressed concerns via email regarding discriminatory and harassing practices at Harvard Business School
     - c) Terminated and retaliated against as a result

2

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

---

## IV.    Summary of Total Compensation Claimed

| Category | Amount |
|---|---|
| **Unpaid Wages** | $401,531.86 |
| **Additional Compensation Package** | $162,500.00 |
| **Total Amount Contested** | **$564,031.86** |

## V.    Short Statements of the Claim
### A. Title VII of the Civil Rights Act of 1964

Plaintiff alleges racial and national origin discrimination by the defendant in violation of Title VII of the Civil Rights Act of 1964. As an Amerindian and African Caribbean woman, plaintiff asserts that the defendant engaged in discriminatory employment practices, including disparate treatment, denial of advancement opportunities, and fostering a hostile work environment. Plaintiff seeks compensatory damages for emotional distress, punitive damages, and other relief as deemed appropriate by the court.

**Examples:**

Harvard's failure to address the prohibition on hair accessories and offensive remarks was evident throughout my tenure. There was also a significant failure to uphold equal employment practices. During the 30-day discussion period, the discrimination I raised was inadequately addressed. Despite my requests for a report, constructive feedback, or a remediation plan, HR and Brenda Fannin provided none.

It was only after filing a Freedom of Information Act (FOIA) request for my EEOC file that I discovered a letter titled "Yanira Gonzalez 30 Day Red Flag," authored by Brenda Fannin on April 23, 2023. This letter not only validated offensive remarks but also failed to document Brenda Fannin's statement: "I knew you were not going to make it at Harvard, I knew you were not fit." This statement contributed to a hostile environment from the outset.

It is reasonable to conclude that if the contents of this letter were never discussed with me between April 23rd and July 12, 2023, they were created after the complaint was made regarding Brenda Fannin's discriminatory behavior. This could have been an effort to establish a precedent and possible

3

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

justification for future discriminatory actions, decisions, and outcomes against me.

Furthermore, Harvard misrepresented facts and intentionally delayed my unemployment benefits. The statement provided to the Department of Unemployment attempted to shift the narrative, portraying me as unable to meet satisfaction regarding the quality and quantity of work produced. This portrayal contradicts the circumstances surrounding my termination.

The approval process for my unemployment benefits took five weeks longer than expected due to the initial denial of my claim based on the wrong and misrepresented situation of "failure to meet expectations of the job." This delay further compounded the difficulties I faced after leaving Harvard.

### B. Age Discrimination in Employment Act of 1967 (ADEA)

Plaintiff alleges age discrimination in violation of ADEA. At 53 years old, plaintiff asserts wrongful termination, changes to her orientation and review period, dismissal of discrimination complaints, and manipulation of reporting structures instead of addressing bias. Additionally, the plaintiff was mocked for "technical challenges" and "mobility issues" when requesting accommodations for long-distance walking between buildings. Plaintiff was told she "would not fit in," despite being selected by a Harvard Business School panel and endorsed by an HR veteran. Plaintiff seeks reinstatement, lost wages, compensatory damages for emotional distress, punitive damages, and other relief as determined by the court.

### C. Title I of the Americans with Disabilities Act of 1990 (ADA)

Plaintiff alleges disability discrimination under ADA, citing a learning disability, dyslexia, and mental health conditions. Defendant dismissed and mocked plaintiff's request for reasonable accommodations, including preparation agendas for meetings. A manager responded, "I didn't know you had a disability," despite the plaintiff's prior disclosure in a company-wide meeting. Plaintiff seeks reasonable accommodations, compensatory damages for emotional distress, punitive damages, and other relief as determined by the court.

Example:

4

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

Harvard failed to support my request for accommodation by neglecting to provide an agenda in preparation for meetings. During one particularly distressing instance, I endured 37 minutes of contentious conversation with a disruptive, abusive, and discriminatory manager. This manager attempted to undermine and humiliate me while I was already in a vulnerable position.

### D. Civil Rights Act of 1991

Plaintiff alleges racial discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. As an Amerindian and African Caribbean employee, plaintiff asserts that the defendant denied a proper orientation and review period, failed to support discrimination complaints, and made disparaging remarks. Plaintiff was treated differently for wearing hair accessories, limiting makeup, and asserting her cultural identity while demonstrating technical expertise within Harvard University. Plaintiff seeks reinstatement, compensatory damages for emotional distress, punitive damages, and other equitable relief as determined by the court.

**Example:**

Harvard retaliated against me after I exercised my right to express myself in defense of justice and denounced discriminatory practices to a broader audience. I brought attention to their internal flaws, inefficiencies, and systemic failures that needed immediate action before pursuing a legal defense in light of the Supreme Court decision.

### E. Federal Family and Medical Leave Act (FMLA)

Plaintiff alleges violation of FMLA due to wrongful termination and denial of medical insurance benefits. Despite being eligible for leave and providing medical documentation, plaintiff's employer terminated her employment and revoked health coverage, violating regulations that protect employees during medical crises. Plaintiff seeks reinstatement, compensation for lost wages and medical expenses, punitive damages, and other relief as deemed just by the court.

**Example:**

Harvard denied my access to medical coverage at a critical time when it was medically necessary for my health. Typically, others retain their insurance and become eligible for Cobra shortly after termination. However, Harvard terminated me and removed my eligibility for short-term disability benefits precisely during this crucial period.

5

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

Despite being aware of the situation, Harvard failed to provide the necessary safeguards, support for employee health, and work-life balance. This lack of support exacerbated the challenges I faced during a time of medical necessity.

## VI.    Summary of Damages
### A.  Unpaid Wages and Compensation

1. Unpaid Wages: $401,531.86
2. Liquidated Damages for Unemployment: $25,000.00
3. Unemployment Period Without Benefits: $15,000.00
4. Retroactive Medical Coverage: $15,000.00
5. Short-Term Disability Coverage: $4,500.00
6. Continuing Education Support (PhD Allowance): $35,000.00
7. Retroactive Pension Plan Savings: $8,000.00
8. Retroactive Matching Allowance for Retirement: To be calculated
9. Eligibility for Administrative Fellowship Program (AFP): $60,000.00

**Total Estimated Compensation Package: $564,031.86**

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

## VII.    Additional Validation and Historical Considerations

Plaintiff proposes additional AI-generated estimates factoring in historical labor inequities. These calculations contextualize unpaid labor contributions from ancestral forced migration and Harvard University's foundational reliance on enslaved workers since 1636.

**AI-Based Compensation Estimate Model**

**Assumption:** Each year of life is valued at 525,600 units (equivalent to $1 per minute).

**Timeline 1 – Historical Ancestry Perspective**

- Estimated lifespan per enslaved individual: **35 years**

- Unpaid wages estimated at **$50,000 per year**

- **Total compensation over 35 years: $1,750,000**

**Timeline 2 – Plaintiff's Lifetime Perspective**

- Plaintiff's current age: **53 years**

- Unpaid wages estimated at **$50,000 per year**

- **Total compensation over 53 years: $2,650,000**

These estimates serve to highlight systemic labor inequities and historic economic disparities. For the purposes of this case, plaintiff supports the streamlined consideration of one category to ensure an expedited resolution.

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

## PERSONAL JOURNEY

### VIII.    Background and Personal Journey: Mi Abuela's Mother

This case of employment discrimination is deeply connected to the forced migration of my ancestors. By sharing these personal anecdotes, I aim to illustrate the lasting struggles for equality, respect, and dignity—past and present. These experiences have profoundly shaped my perspective on justice and fairness in the workplace.

#### A.   Historical Context: Forced Migration and Ancestral Struggles

The migration of the Arawak people from the Amazon Basin to the Caribbean islands represents a pivotal chapter in indigenous history. Around 500 CE, Arawak-speaking groups expanded northward and eastward, settling in regions like Ayiti, Kiskeya, Quiskeya,where they established vibrant chiefdoms and agricultural societies. My ancestors belonged to the **Maguana Chiefdom**, specifically Bocas de Los Arroyos, Yaguate—known as *"the hill of rocks."*

The Taíno, a subgroup of Arawak-speaking peoples, flourished in complex chiefdoms until 1492, when Christopher Columbus arrived. His landing marked the beginning of systematic violence, enslavement, and genocide against my ancestors, erasing generations of cultural identity and autonomy.

European monarchs fueled this devastation:

- **Queen Isabella I & King Ferdinand II of Spain** sponsored Columbus's voyages, enabling mass displacement and brutal colonization.

- **King John II of Portugal** financed African coastal explorations and later backed Vasco da Gama's navigation to India.

- **King Charles I of Spain** empowered conquistadors like Hernán Cortés (Aztec destruction) and Francisco Pizarro (Inca conquest).

8

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

- **King Manuel I of Portugal** supported additional colonial expansion into Brazil.
- **King Francis I of France** sponsored North American expeditions, further entrenching European imperialism.
- **The Vatican,** a silent yet powerful orchestrator of influence.

These global patterns of exploitation paved the way for institutions—including Harvard University—to amass wealth and power while historically excluding indigenous voices from their foundations.

## IX.    Historical Context: Forced Migration and Ancestral Struggles.

### A.  Personal Ancestry: A Lineage of Survival

Despite centuries of displacement and erasure, my ancestors persisted. **Dionisia, my abuela's grandmother, was born in 1825 in Bocas de Los Arroyos, Yaguate.** This name, rich in Arawak and Taíno linguistic history, means *"the hill of stones"* and *"mouth of the rivers,"* reflecting the land's enduring spirit.

She passed her resilience to **Ramona, Ana, and Marina**—three generations of women who, like me, carried the legacy of survival and resistance. Born in 1971, I carry forward their struggles, shaped by the same cultural identity that once thrived before colonial destruction.

As a child, my environment mirrored my ancestors' deep connection to nature. Frogs, cocuyos (fireflies), and lizards filled my surroundings, affirming a lived experience that ties my personal journey to the empirical history of indigenous existence.

### B.  Ancestral Pain and the Present Battle for Justice

The termination of my employment at Harvard University reignited historical injustices—echoing the systemic exclusion that has persisted for centuries. My dismissal was not merely a professional setback; it was an act of disregard for my ethnic, racial, and cultural identity.

My freedom of speech—a right granted by a Constitution built upon land stolen from indigenous communities—was used against me when I sought to assert my perspective within the workplace. My bloodline spans across cardinal points, tracing its roots from the Tequesta in the south to the Hopi in the west—and many more I am yet to reconnect with.

9

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

This case stands not only as a personal fight for fairness but as a testament to the ongoing struggle for indigenous and marginalized communities seeking rightful recognition in systems that historically excluded them.

### C. Impact on Identity

Forced migration shaped the identity and values of my family across generations, instilling resilience, determination, and a deep connection to the land. That legacy of survival continues today, manifesting in efforts to protect forests, the environment, and sacred spaces that hold ancestral significance.

### D. A Legacy of Migration and Cultural Identity

My great-grandmother was born in 1842—technically within Gran Colombia—during a time when the population was a mix of *criollos, mestizos, cholos,* and *mulatos.* While all these people shared Haitian roots, political geography shifted drastically in 1844 due to yet another territorial conflict driven by the same forces that had once terrorized our ancestors.

For generations, my family thrived on beautiful land in **Bocas de Los Arroyos**, a place where nature and tradition intertwined. We lived sustainably, cultivating a small farm with a choza for cooking and storage, firing up a mud oven with charcoal to make cassava and arepas. Our home was a hub for honoring the dead with *los montados,* where community and history merged in sacred farewells.

The land provided everything—zapote, mamey, níspero, hobos, limoncillos, and charanpolas. We grew plantains, yuca, batata, ñame, and nurtured molondrón and pan de fruta. We had cows, goats, chickens, pigs, a donkey, and a horse—reserved only for special occasions. It was paradise, untouched by the greed of external forces.

### E. Harvard's Investment and the Erosion of Indigenous Wealth

However, in 1899, Harvard University entered the scene through **the Consorcio Azucarero Italiano de La República Dominicana** (*Italian Sugar Consortium of the Dominican Republic / Ingenio CAEI*), financially backing sugar production operations in the region. The consortium, led by Italian investors, controlled vast sugar plantations, disrupting local land ownership and economic structures.

Harvard's involvement in sugar investments had profound and lasting consequences for my family—particularly my **abuela, Ana Aquino Guzman.** The university's financial stake reshaped land distribution, labor policies, and social dynamics in ways that marginalized indigenous and Afro-Caribbean communities. While we retained some of our land, Harvard's economic

10

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

influence set forth waves of dispossession that would impact generations to
come.

### F.  Further Exploitation: Cement Extraction and Corporate Expansion

Land disruptions did not stop with sugar production. The surrounding areas of
our ancestral home fell under the control of yet another
corporation—Cementos Argos. This cement factory, part of the powerful
Santo Domingo Family conglomerate, extracted the very rocks that defined
our landscape, stripping away the physical essence of Bocas de Los Arroyos.

This family maintained direct ties to European nobility, including the House of
Grimaldi, Wellesley, and the House of Hohenzollern, embedding their
influence into industries that profited from our stolen land. They even branded
a cement product **"Yaguate,"** produced from the rocks that once belonged to
us, their extraction symbolizing a deeper historical erasure.

As a child, I was unaware of this geopolitical and financial entanglement—but
the effects were palpable. Stories of struggle, discrimination, forced migration,
unpaid labor, financial manipulation, and systemic barriers to education were
passed down, shaping my understanding of the world.

### G.  Personal Forced Migration and Harvard's Role in My Story

By 1990, it was my turn. A forced migration to New York—another chapter in
the generational displacement my ancestors endured. Harvard University had
a direct hand in this part of my life as well. My voice, rooted in the truth of
Yaguate and its original people, was silenced when I defended our history, our
ties to Haiti, my beautiful hair, and my unapologetic blackness.

That defiance led to expulsion, severing my connection to institutional
education while reinforcing the same oppressive cycles that had displaced my
ancestors for centuries. Yet, just as those before me resisted, I carry forth
their fight for recognition, justice, and the reclamation of identity that Harvard
and other powerful institutions have long sought to suppress.

### H.  Parallel Experiences, Legal, and Social Justice

This case of employment discrimination mirrors the struggles my ancestors
faced in their homeland, highlighting the persistent themes of injustice,
inequality, and the fight for respect.

One historical event that deeply resonates with my frustration and anger is the
Wounded Knee Massacre on December 29, 1890, at Wounded Knee Creek
on the Lakota Pine Ridge Indian Reservation in South Dakota. This tragic
attack marked the violent culmination of tensions between the U.S.

11

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

government and Native American tribes—particularly the Lakota Sioux—ending the Indian Wars on the Great Plains and serving as a stark example of state-sponsored oppression.

## X.    Harvard's Role in 1890: Power, Wealth, and Institutional Silence

In the same year, Harvard University housed several prominent intellectual figures—leaders in theology, philosophy, economics, and law—all of whom shaped academic discourse but left no documented legacy of using their power to uplift the indigenous communities their institution impacted.

### Key Harvard Scholars in 1890

- **Francis Greenwood Peabody (Theology)** – Professor of Christian Morals at Harvard Divinity School, shaping liberal Protestant theology and social ethics.

- **William James (Philosophy)** – Pioneer of American psychology, influential in pragmatism and philosophy of the mind.

- **William Z. Ripley (Economics)** – Economist and sociologist studying industrial organization and race relations.

- **James Barr Ames (Law)** – Dean of Harvard Law School and contributor to modern case law methods.

Their writings shaped generations of scholars, but history lacks evidence of their practical efforts to address systemic injustice or support indigenous communities. Harvard's financial and intellectual legacy continued to expand, yet the suffering of the people affected by its institutional wealth remained unaddressed.

## XI.    The Global Interconnection of Indigenous Struggles

The original people of every tectonic plate were once bound together on a single landmass. My pain is the same pain felt by Brazil, Guatemala, Jamaica, Kenya, Burkina Faso, Ethiopia, Angola, Samoa, and the Philippines. We share histories of displacement, exploitation, and stolen wealth.

My case is more than personal—it is a plea for overdue justice, a reclamation of stolen dignity.

### A.    Forced Migration: The Struggle for Validation

1. I was forced to migrate. To beg for a visa. To **prove my worth** and my "potential for good."

12

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

2. I worked **fives times as hard for access to education.**

3. I accumulated **eight  times the debt** just to be eligible for the *same opportunities as others*.

4. I waited **ten times longer to move up the career ladder**, knowing my skills, attitude and creativity were as strong—if not stronger—than those who advanced before me.

When I mesmerized an eight-person panel to validate my credentials for the Sr. Project Manager position, I had no doubts about my ability—I didn't need validation. I knew my craft, my skills, my expertise. Yet the system demanded a greater burden from me, while those who once terrorized my ancestors built legacies of wealth, power, and legal control over education.

## XII.   Historic and Ongoing Abuses

The oppression I have faced mirrors past injustices:

- 1887 Dawes Act – The forced allotment of indigenous lands, breaking communal ties and sovereignty.

- 1890 Wounded Knee Massacre – A terrorist act against Native Americans exercising their right to culture, love, and respect for the land.

- The Rockefeller Foundation has been exploiting Brazil since 1910.

- 1913 Land Appropriation in South Africa: The Natives Land Act restricts black South Africans from owning land outside of specific reserves, exacerbating land inequality and dispossession.

- Late 19th to mid-20th century Guatemala - United Fruit Company: Significant land concessions lead to conflicts over land rights, labor conditions, and political influence.

- 1952-1960 Mau Mau Uprising in Kenya: Kikuyu people resist British colonial land policies and dispossession.

- 1971 Alaska Native Claims Settlement Act: A delayed response to land dispossession.

13

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

- Late 20th century Honduras - United Fruit Company and Agrarian Reforms: United Fruit Company leads to land disputes and subsequent agrarian reforms.

- 1980s Land Issues in Zimbabwe: Government redistributes land from white farmers to black Zimbabweans, causing political and economic tensions.

- Ogoni Land and Shell Oil in Nigeria: Ogoni people protest against Shell Oil for environmental degradation and unfair resource exploitation in the Niger Delta.Shell Oil, along with other multinational oil companies, has been active in the Niger Delta since the 1950s.

- 1993 Nunavut Land Claims Agreement (Canada): Indigenous communities wait decades for rightful recognition.

- 1964-1985 Military Dictatorship in Brazil: During this period, land grabbing, exploitation of natural resources, and displacement of indigenous peoples intensified.

- 2019-present Amazon Rainforest Deforestation: Rampant deforestation and land grabbing threaten indigenous territories and biodiversity in the Amazon rainforest.

- Italian Settlements in Watamu: Since the early 20th century, Italians have been involved in establishing settlements and acquiring land in Watamu, a coastal town in Kenya.

## XIII.    Conclusion: A Case Beyond Employment

This case is not just about a job. It is about historical accountability, a confrontation with entrenched systems of oppression, and a long-overdue demand for justice—not just for me, but for every displaced and marginalized people throughout history.

### A. Punitive Damages and Reparations

My recovery, reparations, and damages are long overdue—now in 2025. Harvard has a financial, social, linguistic, intellectual, academic, philosophical, and spiritual obligation to the original people of our planet's tectonic plates. In this case, I speak on behalf of all those affected, demanding that the proceeds be allocated to address three main issues that are essential for justice and equity.

#### 1. Issue 1: Return of Land to the Original Guardians of the Earth

14

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

Land must be returned to "los verdaderos"—the rightful
protectors and guardians of the planet. The historical system
that exploited indigenous land and labor was meticulously
documented, particularly through the sugar plantation tabulation
system.

A highly regulated industry, sugar plantations assigned
monetary value to everything—from enslaved laborers to
livestock. Every acre was accounted for, reinforcing a deeply
entrenched economic model that enabled institutions like
Harvard, Cambridge, and Oxford to profit off displacement and
oppression. As James Walvin explains in *How Sugar Corrupted
the World*, doubts about slavery only emerged in the mid-to-late
18th century—long after the system had been firmly established.

A similar tabulation method should be employed to calculate and
facilitate land restitution. Harvard must acknowledge its role and
lead efforts in returning land to indigenous communities.


## 2.  Issue 2: Clean Water Accessibility for All

Access to clean water is a fundamental human right that must
be prioritized.

Estimated cost per person per day: $1.63

Annual cost: $595.95

Total cost over a 53-year lifespan: $30,989.40

This amount is equivalent to the cost of a single Harvard
student's suit—a stark reminder of the economic disparities that
persist. Technology-driven solutions such as simulations,
hackathons, and nonprofit initiatives can solve this issue within
nine months.

To illustrate feasibility:

- Amazon Web Services' average product launch timeline:
  6 months to 1 year
- UK Amazon Publishing process: 6 months to 1 year

If corporations can move at this pace for profit-driven projects, a
global clean water initiative should be implemented with similar
urgency.

15

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

### 3. Issue 3: Eliminating Slums Created by Forced Migration

Forced migration, exploitation, and economic disparity have created slums worldwide. These must be systematically eliminated through real estate returns, structural planning, and sustainable economic reinvestment.

Estimated timeline for resolution: 525 days

- Manhattan Project timeline: ~2 years
- Combined square footage of Rockefeller Center + The Cloisters: 4,483,000 sq. ft.

Housing Feasibility Calculation

Using standard residential space guidelines:

- 500 sq. ft. per person: ~8,966 people housed
- 800 sq. ft. per person: ~5,603 people housed

Through urban reinvestment and reclamation of stolen land, displaced communities can be restored and provided dignified living conditions.

## XIV.  Harvard's Role: A Legacy of Colonial Influence

The dissolution of Gran Colombia was influenced by European powers seeking economic control through debt diplomacy, free trade economics, and financial leverage. Britain's banks profited from Gran Colombia's weaknesses, exacerbating regional instability and ensuring dominance over land and resources.

Harvard stands today as a direct representation of British influence—a continuation of colonial control over regions like Yaguate, San Cristóbal, and countless others. As a descendant of indigenous and Afro-Caribbean slaves, I have lived the generational consequences of this institutional power. My wrongful termination—based on my hair, my warrior spirit, and my determination to stand for justice—is yet another manifestation of this historic oppression.

## XV.  Conclusion: A Call for Action

This case is not just about my personal damages—it is about confronting deep-seated systemic injustices perpetuated by institutions like Harvard. Land, water, and dignity must be restored to the original stewards of our

16

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

planet, and the mechanisms used to exploit indigenous people must now be used to repair and return what was taken.

Harvard's financial and ideological influence must be redirected toward global restitution, ensuring that justice is not merely spoken but acted upon.

This can start with my case.

BEST AVAILABLE COPY

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Houston District Office
1919 Smith Street, 6th Floor
Houston, TX 77002
(346) 327-7700
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/22/2025

**To:** Mrs. Yanira Gonzalez
2585 Broadway SUite 2116, New York, NY 10025
Charge No: 523-2024-00377

**EEOC Representative and email:**  NELLY TAMEZ
EEO Investigator
Nelly.Tamez@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Rayford O. Irvin
01/22/2025
Rayford O. Irvin
District Director

**Cc:**
Amanda Broderick
1350 Massachusetts Ave, Suite 980
Cambridge, MA 02138

Elizabeth Farrenkopf
Harvard University
1350 MASSACHUSETTS AVE STE 980
Cambridge, MA 02138

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

#### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

#### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

#### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 523-2024-00377 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 523-2024-00377 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

Enclosure with EEOC Notice of Closure and Rights (01/22)

- An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

- An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC  FEPA | 523-2024-00377 |

| Massachusetts Commission Against Discrimination | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| I Name *(Indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.)* | Home Phone | Year of Birth |
|---|---|---|
| Mrs. Yanira Gonzalez | (305) 893-6408 | 1971 |

Street Address

2585 Broadway SUite 2116

New York, NY 10025

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE | 501+ Employees | |

Street Address

1350 MASSACHUSETTS AVE STE 980

CAMBRIDGE, MA 02138

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Color, Disability, Race, Retaliation | 06/01/2023 | 11/01/2023 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

My name is Yanira Gonzalez and I was employed by Harvard Business School from March 20, 2023, through July 12, 2023, as a Senior Project Manager.

In April and May 2023, I was discriminated against by my supervisor, Brenda, regarding my hair and ethnic accessories. "You should not use any accessories, this is Harvard. You cannot wear a headband or scarf. The students wear $40,000 suits here." Brenda then undermined whether I would make it here, whether I would fit in.

I informed her that eight people selected me for this job. She said it was a mistake. After I reported this incident to Human Resources in May 2023, I did not have direct meetings with Brenda. Then, Rachel Noiseux the Project Management leader/VP/Director communicated my assignment to a

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Mrs. Yanira Gonzalez**  03/23/2024 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Charging Party Signature* | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 523-2024-00377 |
| | FEPA | |

| Massachusetts Commission Against Discrimination | and EEOC |
|---|---|
| *State or local Agency, if any* | |

new Manager, Samantha Amburgey,  different supervisor. There are two meetings with both Rachel and Samantha. On my first 1:1  on June 27th at 9:30 AM with  Samantha Amburgey, she dismissed my child's medical situation after his surgery.  During my termination call on July 12, 203, Rachel Noiseux (VP or Director boss of Brenda and Sam) along with,  Heath Racine (HR)  stated during the termination meeting "that I have requested too many accommodations based on the time off for surgery, and request to exercise the benefits for holiday after 90 days give the change to a new Orientation and Review cycle.

Human Resources asked me to clarify what accommodation I requested. He told me he would come back to me. My orientation period was then changed, typically people go to 90-day probationary period, I was going to get a 180-day probationary period. This meant the Orientation and Review (OR) cycle, expected to end on June 20 2023, was now scheduled to end on August 20, 2023.

Also in May 2023, I informed Brenda that I needed an agenda for working sessions. I requested multiple times that this would assist me in doing my job effectively and she crossed her arms, refusing to provide this accommodation to me. At this time, she was aware of my learning disability, and it was a necessary undue hardship to perform my role to the best of my ability.

In July 2023, I publicly supported the Supreme Court decision against Harvard regarding systemic discrimination. They had not followed up with me regarding my race discrimination or reasonable accommodation, so I did respond to the university agreeing with the decision.

I was terminated on July 12, 2023 "with cause", but Harvard refused to provide any documentation with the reasons for termination for several months, when I requested a reason for the delay on unemployment benefits.

The termination on July 12, and the subsequent delay in approving unemployment benefits, appear to me as an act of retaliation. They also canceled my insurance coverage effective immediately, but other employees terminated or resigned get at least 30 days more of coverage after termination day. The fact that they chose to terminate my medical coverage in the middle of medical procedures and services for my family, is in itself a discriminatory, retaliatory, deliberate harmful action and further creating a new undue hardship.

I believe I was discriminated and retaliated against based on my race, African American, in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe I was also discriminated against for being associated with someone who has a disability, in violation of the Americans with Disabilities Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Mrs. Yanira Gonzalez** 03/23/2024 | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE *(month, day, year)* |
| *Charging Party Signature* | |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**CHARGE OF DISCRIMINATION**

For Official Use Only – Charge Number:

EEOC Form 5A (June 2023)

| | |
|---|---|
| **Personal Information** | First Name: Yanira    MI: ____    Last Name: Gonzalez<br>Address: 2585 Broadway    Apt.: 116<br>City: New York    County: Manhattan    State: NY    Zip Code: 10025<br>Phone: 3057936408    Home ☐ Work ☐ Cell ☐    Email: peoplecommunityworld@gmail.com |
| **Who do you think discriminated against you?** | Employer ☐    Union ☐    Employment Agency ☐    Other Organization ☐<br>Organization Name: Harvard Business School<br>Address: Soldiers Field    Suite: ____<br>City: Boston    State: MA    Zip Code: 02163    Phone: 6173847489 |
| **Why you think you were discriminated against?** | Race ☐    Color ☐    Religion ☐    Sex ☒    National Origin ☐    Age ☐    Pregnancy ☐<br>Disability ☐    Genetic Information ☐    Retaliation ☐    Other ☐(*specify*) African hair |
| **What happened to you that you think was discriminatory?** | Date of <u>most recent job action</u> you think was discriminatory: July 12, 2023<br>**Also describe briefly <u>each job action</u> you think was discriminatory and when it happened (estimate).**<br><br><br>FORM-UNABLE TO USE AS FILLABLE PDF. ATTACHED FILE. On July 12, 2023, I |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br>Signature: *Yanira Gonzalez*    Date: JAN 10, 2024 |

YANIRA GONZALEZ
305-793-6408


**U.S. Equal Employment Opportunity Commission**

You recently submitted an inquiry, **523-2024-00377 on November 6th.**

**FOLLOW UP Form as requested by**
**JOSEPH JACKOWSKI** JOSEPH.JACKOWSKI@eeoc.gov **on January**
**4th, 2024.**


On July 12, 2023, I was discharged by Harvard Business School during my 90 days
orientation and review period.
There are four main reasons:
MAY 2023, AND JUNE 2023 1) I was discriminated by the manager regarding my hair
and ethnic accessories.
JUNE 2023-2) After reporting incidents to HR, I was changed to another manager
who dismissed my child's medical situation,
JULY 2023-3) I supported publicly the supreme court decision against Harvard
regarding systemic discrimination.
JULY 2023-4) I was retaliated for using the DISABILITY accommodation resources,
bringing my discrimination complaint to leadership.
SEPTEMBER 2023-5)After the termination, HBS delayed approving my
unemployment claim for about 7 weeks.
SEPTEMBER 2023-6) HBS Refused to provide written statement regarding the
"cause" or "reasons" for termination and the the MA Department of Unemployment
stated HBS communicated to them that I "failed to perform to HBS standards". HBS
refused to confirmed in writing such statements.

Confidential Memo to the file.

2025-01-22

Monthly Case Review.

The charge was briefly discussed and reviewed with Michael Lightner, Supervisor. Based on my review it was decided to move forward with the issuance of the NRTS.


Nelly Tamez

 **U.S. Equal Employment Opportunity Commission**
**Notification & Acknowledgement of Dual-Filed Charge**

(This Notice replaces EEOC FORM 212-A)

03/15/2024

EEOC Number: 523-2024-00377
FEPA Number:

This is notice that a charge of employment discrimination, Mrs. Yanira Gonzalez v. PRESIDENT AND FELLOWS OF HARVARD COLLEGE was initially received by New York District Office on 01/19/2024 and will be dual-filed with Massachusetts Commission Against Discrimination.

Pursuant to the worksharing agreement, the New York District Office intends to Investigate Charge.

The Massachusetts Commission Against Discrimination acknowledges receipt of the referenced charge, Mrs. Yanira Gonzalez v. PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and intends to Defer Investigation.

Issued by:                                                    Issued on:
New York District Office                                     03/15/2024

Acknowledged by:                                             Acknowledged on:
Massachusetts Commission Against Discrimination              03/15/2024

EEOC (Inquiry) Number: **523-2024-00377**

## INQUIRY INFORMATION

### INQUIRY OFFICE

**Receiving:** Houston District Office

**Accountable:** Houston District Office

### POTENTIAL CHARGING PARTY

**Name:** Mrs. Yanira Gonzalez

**Address:** 2585 Broadway SUite 2116, New York, NY 10025

**Year of Birth:** 1971

**Email Address:** peoplecommunityworld@gmail.com

**Phone Number:** (305) 893-6408

### POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** Female

**Disabled?** Yes

**Are you Hispanic or Latino?** No

**Ethnicity:**

**National Origin:** American (U.S.) Origin

### RESPONDENT/Employer

**Organization Name:** PRESIDENT AND FELLOWS OF HARVARD COLLEGE

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** 20 or more employees

**Primary Address:** 1350 MASSACHUSETTS AVE STE 980

Cambridge, MA 02138, UNITED STATES OF AMERICA

**County:** Middlesex

**Phone Number:**

**Work Address:**

**Remote Work:** false

### RESPONDENT CONTACT

**Name:** Elizabeth Farrenkopf

**Email Address:** efarrenkopf@hinckleyallen.com

**Phone Number:** (617) 378-4123

**Title:** Attorney

### REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 04/05/2023

**Reason for Complaint:** National origin and/or ethnicity, Disability, Retaliation - I filed a charge of job discrimination about any of the above, Retaliation - I complained to my employer about job discrimination

**Pay Disparity:**

**Location of Incident:** Massachusetts

**Submission (Initial Inquiry) Date** 11/01/2023

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:**

**Charge Number:** 523-2024-00377

**Claim previously filed as complaint with another Agency?** No

**Agency Name:**

**Approximate Date of Filing:**

**Nature of Complaint:**

<u>**ADVERSE ACTION(s)**</u>

On May 4th, 2023-Harvard Business School Manager refused to extend an apology for her inappropriate, unlawful and disrespectful remarks and refused my request for accommodation to prepare for a meeting by having preliminary discussion points. (Zoom call recording for 45 minutes available as evidence)

On June 2023, Harvard Business School re-moved the manager as from my reporting responsibility and the Director was my interim manager until a replacement. This meant my Orientation and Review 90 days period was going to be reset and a new manager was going to be assigned.

On July 10, 2023, I ask for benefits details regarding medical leave and short-term disability access process for filing a claim and the details were emailed.

On July 12, 2023, Harvard Business School Director called me for a meeting and ?discharged? me on the grounds that I used too many resources, ask for too many accommodations and did not fit Harvard ?culture?.

<u>**APPOINTMENT**</u>

**Appointment Date and time:**

**Interview Type:**

<u>**APPROXIMATE DEADLINE FOR FILING A CHARGE:**</u> 01/30/2024

## **Supplemental Information**

### **What Reason(s) were you given for the action taken against you?**

I was told I did not "fit culture". The reasons were that I asked for too many accommodations, requested too many support assistance for dealing with the discriminating manager and ultimately, my support for the Supreme Court decision against Harvard was also a contributing factor.

### **Was anyone in a similar situation treated the same, better, or worse than you?**

I was the first candidate unanimously supported by the whole interview selection panel with all yes to hire decision. This was informed to me by "Racine, Heath" hracine@hbs.edu and Sen, Chirajeet csen@hbs.edu

I was at Harvard Business School for four (4) months only, so do not have background information about others with my profile and with my condition.

Orientation and Review Period of 90 days was extended to me due to my complaint regarding the manager's comments.

I was not extended an apology for the unlawful and disrespectful acts.

My claim for short term disability to address my own medical condition was denied because Harvard canceled my policy the same day of my termination.

As per HR, this is the first time Harvard canceled my medical insurance on the same day of my termination.

I was the first employee terminated during my 90 days orientation.

I was the first employee with medical coverage and disability coverage termination the same date of discharge.

### **Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.**

The only person who has more than 20 years on the role and aware of my concerns regarding the hair, disability and merits remark from manager is named Jim Borron -but he is now retired from HBS and I was the last hired for his role. jborron@hbs.edu <jborron@hbs.edu

These are all the participants to the events on my claim.

Rachel Noiseux- rnoiseux@hbs.edu

Elizabeth Clark - eclark@hbs.edu

Fannin, Brenda <bfannin@hbs.edu>

Noiseux, Rachel <rnoiseux@hbs.edu>\

"Fatemi, Hannah" <hfatemi@hbs.edu>\

"Racine, Heath" hracine@hbs.edu

Amburgey, Samantha <samburgey@hbs.edu>

Sen, Chirajeet csen@hbs.edu

jborron@hbs.edu <jborron@hbs.edu

### **Please tell us any other information about your experience.**

I would like to send you zoom video recording supporting for the abusive and violation of federal law for disability support and accommodation and denial of "knowledge of my condition".



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Houston District Office**

Mickey Leland Federal Building
1919 Smith Street 6th Floor
Houston, TX 77002
Free: (833) 827-2920
ASL: (844) 234-5122
FAX: (713) 651-4901
Website: www.eeoc.gov

02/26/2025

VIA: yaniraelizabethgonzalez@gmail.com
Yanira Gonzalez
9 Westcliffe Court
Apt 517
Prescot, Knowsley L34 3NE

Re:     FOIA No.: 460-2025-006307
        Charge No.: 523-2024-00377

Dear Ms. Gonzalez:

Your Freedom of Information Act (FOIA) request, received on 01/30/2025, is processed. Our search began on 01/30/2025. All agency records in creation as of 01/30/2025 are within the scope of EEOC's search for responsive records. The paragraph(s) checked below apply.

[  ]     Your request is granted.

[  ]     Your request is denied:

        [  ]     based on exemptions pursuant to the subsections of the FOIA;

        [  ]     as it does not reasonably describe the records you wish disclosed;

        [  ]     as no records fitting the description of the records you seek disclosed exist or could
                be located after a thorough search.

[X]     Your request is granted in part and denied in part. Portions not released are withheld pursuant to
        the subsections of the FOIA indicated at the end of this letter.

[X]     A fee of $ 0 is charged. Charges for manual search and review services are assessed according
        to the personnel category of the person conducting the search a. Fees for search services range
        from $5.00 per quarter hour to $20.00 per quarter hour. Direct cost is charged for computer search
        and in certain other circumstances. Photocopying is .15 per page. 29 C.F.R. §1610.15. The fee(s)
        charged is computed as follows:

        [  ]     Commercial use request: [  ] pages of photocopying; [  ] quarter hour(s) of [  ] review
                time; and [  ] quarter hour(s) of [  ] search time. Direct costs are billed in the amount
                of [  ] for [  ];

        [  ]     Educational or noncommercial scientific institution or a representative of the news
                media request: [  ] pages of photocopying. The first 100 pages are provided free
                of charge; and

        [X]     All other requests: [354] pages of photocopying and [  ] quarter hour(s) of search
                time. Direct costs are billed in the amount of [  ] for [  ]. The first 100 pages and the
                first two hours of search time are provided free of charge.

                Please submit payment of $ 0 by either:

460-2025-006307

      (1) Credit card at **pay.gov.** Visa, MasterCard, American Express and Discover credit cards are accepted. Debit cards bearing the Visa or MasterCard logo are also accepted. We will finish processing your request after EEOC receives a copy of your pay.gov credit or debit card receipt or

      (2) Check, payable to the United States Treasurer, to the address above.

[X]    The disclosed records are enclosed. No fee is charged because the cost of collecting and processing the chargeable fee equals or exceeds the amount of the fee. 29 C.F.R. § 1610.15(d).

[ ]    The disclosed records are enclosed. Photocopying and search fees have been waived pursuant to 29 C.F.R. § 1610.14.

[X]    I trust that the furnished information fully satisfies your request. If you need any further assistance or would like to discuss any aspect of your request, please do not hesitate to contact the FOIA Professional who processed your request or our FOIA Public Liaison (see contact information in above letterhead or under signature line).

[X]    You may contact the EEOC FOIA Public Liaison Michael L. Heise for further assistance or to discuss any aspect of your request. In addition, you may contact the Office of Government Information Services (OGIS) to inquire about the FOIA mediation services they offer.

    The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, email at ogis@nara.gov; telephone at (202) 741-5770; toll free 1-877-684-6448.

    The contact information for the FOIA Public Liaison is as follows: Michael L. Heise, EEOC FOIA Public Liaison, Office of Legal Counsel, FOIA Division, Equal Employment Opportunity Commission, 131 M. Street, N.E., Fifth Floor, Washington, D.C. 20507, email to FOIA@eeoc.gov, telephone at (202) 921-2542; or fax at (202) 827-7545.

[X]    If you are not satisfied with the response to this request, you may administratively appeal in writing. Your appeal must be postmarked or electronically transmitted in 90 days from receipt of this letter to the Office of Legal Counsel, FOIA Division, Equal Employment Opportunity Commission, 131 M Street, NE, 5NW02E, Washington, D.C. 20507, email to FOIA@eeoc.gov; online at https://eeoc.arkcase.com/foia/portal/login, or fax at (202) 827-7545. Your appeal will be governed by 29 C.F.R. § 1610.11.

[ ]    See the comments below.

        Sincerely,

        *Yvette M. Stewart*

        Rayford O. Irvin    FOR
        District Director
        housfoia@eeoc.gov

460-2025-006307

Applicable Sections of the Freedom of Information Act, 5 U.S.C. § 552(b):

**Exemption(s) Used:**

| | |
|---|---|
| [ ]  (b)(3)(A)(i) | [X]  (b)(6) |
|     [ ] § 706(b) | [ ]  (b)(7)(A) |
|     [ ] § 709(e) | [X]  (b)(7)(C) |
|     [ ] § 107 of the ADA | [ ]  (b)(7)(D) |
|     [ ] § 207 of the GINA | [ ]  (b)(7)(E) |
| [ ]  (b)(4) | [ ]  (b)(7)(F) |
| [X]  (b)(5) | |

**Exemption(s) Used:**


**Information Withheld Pursuant to Exemption (b)(5) to the FOIA:**

Disclosure of preliminary assessments and opinions would create a chilling effect on the Commission staff's ability to freely and openly deliberate and discuss ideas, strategies, and recommendations, thereby impairing the Commission's ability to effectively and efficiently enforce applicable federal EEO laws by investigating charges and complaints, litigating and adjudicating cases, promulgating regulatory and sub-regulatory guidance, conducting outreach and education activities, and other related activities.


**(b)(5)**

Exemption (b)(5) to the Freedom of Information Act (FOIA), 5 U.S.C.  § 552(b)(5) (2016), as amended by the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, permits withholding documents that reflect the analyses and recommendations of EEOC personnel generated for the purpose of advising the agency of possible action.  This exemption protects the agency's deliberative process and allows nondisclosure of "inter-agency or intra-agency memorandums or letters which would not be available to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The exemption covers internal communications that are deliberative in nature.  National Labor Relations Board v. Sears, Roebuck & Co., 421 U.S. 132 (1975); Hinckley v. United States, 140 F.3d 277 (D.C. Cir. 1998); Mace v. EEOC, 37 F. Supp. 2d 1144 (E.D. Mo. 1999).  The purpose of the deliberative process privilege is to "allow agencies freely to explore alternative avenues of action and to engage in internal debates without fear of public scrutiny." Missouri ex. rel. Shorr v. United States Corps of Eng'rs., 147 F.3d 708, 710 (8th Cir. 1998).  Disclosure of preliminary assessments and opinions would create a chilling effect on the Commission staff's ability to freely and openly deliberate and discuss ideas, strategies, and recommendations, thereby impairing the Commission's ability to effectively and efficiently enforce applicable federal EEO laws by investigating charges and complaints, litigating and adjudicating cases, promulgating regulatory and sub-regulatory guidance, conducting outreach and education activities, and other related activities.   Records may be withheld under this exemption if they were prepared prior to an agency's decision, Wolfe v. Dep't of Health and Human Services, 839 F.2d 768, 775, 776 (D.C. Cir. 1988) (en banc) and for the purpose of assisting the agency decision maker.  First Eastern Corp. v. Mainwaring, 21 F.3d 465,468 (D.C. Cir. 1994).  See also, Greyson v. McKenna & Cuneo and EEOC, 879 F. Supp. 1065, 1068, 1069 (D. Colo. 1995).  Records may also be withheld to the extent they reflect "selective facts" compiled by the agency to assist in the decision-making process.  A. Michael's Piano, Inc. v. Federal Trade Commission, 18 F.3d 138 (2d Cir. 1994).  An agency may also withhold records to the extent that they contain factual information already obtained by a requester through prior disclosure.  See Mapother, Nevas, et al. v. Dep't of Justice, 3 F.3d 1533 (D.C. Cir. 1993).

460-2025-006307

DOCUMENTS WITHHELD PURSUANT TO EXEMPTION (b)(5) TO THE FOIA:

1. Investigator's Notes/ Work Product: (6 pages, 67 lines Redacted)
2. Activity Log: (28 pages, 52.5 lines Redacted)

---------------------------------------------------------------------------------------------------------------------------

**(b)(6)**

Exemption (b)(6) to the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(6) (2016), as amended by the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, permits withholding of information about individuals in "personnel and medical files and similar files" if its disclosure "would constitute a clearly unwarranted invasion of personal privacy." In addition to personnel records and medical files, the term "similar files" encompasses all information that "applies to a particular individual." Dep't of State v. Washington Post Co., 456 U.S. 595, 599-603 (1982). This exemption requires that the privacy interests of the individual be balanced against the public interest in disclosure. Dep't of the Air Force v. Rose, 425 U.S. 352, 372 (1976). In examining whether there is a "public interest" in disclosure of certain information, the "public interest" must truly be in the interest of the overall public. In United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989), the Supreme Court explained that only "[o]fficial information that sheds light on an agency's performance of its statutory duties" merits disclosure under FOIA, and noted that "disclosure of information about private citizens that is accumulated in various governmental files" would "reveal little or nothing about an agency's own conduct."\n\nPersonal details pertaining to an individual are generally protected under this exemption. See, e.g., DOD v. FLRA, 510 U.S. 487, 500-502 (1994) (finding privacy interest in federal employees' home addresses even though they often are publicly available through sources such as telephone directories and voter registration lists); Pons v. United States Customs Service, No. 93-2094,1998 U.S. Dist. LEXIS 6084 at **13-14 (D.D.C. April 27, 1998) (protecting identities of lower and mid-level agency employees who worked on asset forfeiture documents); Barvick v. Cisneros, 941 F. Supp. 1015 (D. Kan. 1996) (finding personal information such as home addresses and telephone numbers, social security numbers, dates of birth, insurance and retirement information, reasons for leaving prior employment, and performance appraisals protectable under Exemption Six). See also, Rothman v. USDA, 1996 Lexis 22716 (C.D. Cal. June 17, 1996) (disclosure of information in the applications of persons who failed to get a job may embarrass or harm them).

DOCUMENTS WITHHELD PURSUANT TO EXEMPTION (b)(6) TO THE FOIA:

1. Redacted PII – Respondent's Financial/business information, the disclosure of which would invade business financial privacy. (2 pages, 2 lines Redacted)

---------------------------------------------------------------------------------------------------------------------------

**(b)(7)(C)**

Exemption (b)(7)(C) to the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(7)(C) (2016), as amended by the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, authorizes the Commission to withhold:\n\nrecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . .\n\nThe seventh exemption applies to civil and criminal investigations conducted by regulatory agencies. Abraham & Rose, P.L.C. v. United States, 138 F.3d 1075, 1083 (6th Cir. 1998). Release of statements and identities of witnesses and subjects of an investigation creates the potential for witness intimidation that could deter their cooperation. National Labor Relations Board v. Robbins Tire and Rubber Co., 437 U.S. 214, 239 (1978); Manna v. United States Dep't. of Justice, 51 F.3d 1158,1164 (3d Cir. 1995). Disclosure of identities of employee-witnesses

460-2025-006307

could cause "problems at their jobs and with their livelihoods."  L&C Marine Transport, Ltd. v. United States, 740 F.2d 919, 923 (11th Cir. 1984).\n\nThe Supreme Court has explained that only "[o]fficial information that sheds light on an agency's performance of its statutory duties" merits disclosure under FOIA, and noted that "disclosure of information about private citizens that is accumulated in various governmental files" would "reveal little or nothing about an agency's own conduct."  United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989).\n\nFor the purposes of determining what constitutes an unwarranted invasion of personal privacy under exemption (b)(7)(C), the term "personal privacy" only encompasses individuals, and does not extend to the privacy interests of corporations. FCC v. AT&T Inc., 131 S.Ct. 1177, 1178 (2011).

DOCUMENTS WITHHELD PURSUANT TO EXEMPTION (b)(7)(C) TO THE FOIA:

1.  Redacted personal information about third parties, such as names, addresses, telephone numbers, social security numbers, and driver's license numbers, the disclosure of which would invade personal privacy. (2 pages, 2 lines Redacted)

--------------------------------------------------------------------------------------------------------------------

For a full description of the exemption codes used please find them at the following URL: https://www.eeoc.gov/foia/freedom-information-act-reference-guide

This response was prepared by Yvette Stewart, Government Information Specialist – FOIA, who may be reached at yvette.stewart@eeoc.gov or (346) 327-7705.



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE



434332267

HARVARD UNIVERSITY
Attn: David Moniz
114 MOUNT AUBURN STREET
CAMBRIDGE, MA 02138

EAN:   72000010
August 31, 2023

| | |
|---|---|
| Claimant Name | Yanira Gonzalez |
| Issue Identification Number | 0081 0389 78-01 |

## Notice of Approval

**Reasoning and Findings**

You discharged the claimant due to inability to meet with your satisfaction with respect to the quality and/or quantity of work produced. Such failure was not due to any deliberate lack of effort by the claimant. Therefore, the claimant's discharge was not attributable to deliberate misconduct in willful disregard of the employing unit's interest.

**Applicable Section of Law**

Massachusetts General Law Chapter 151A, §25(e)(2)

**Effect of this Determination**

The claimant is eligible to receive benefits beginning 6/25/2023 as long as all other eligibility requirements are met.

100 CAMBRIDGE ST, 4TH FLOOR, SUITE 400 ● BOSTON, MA 02114
www.mass.gov/dua

Yanira Gonzalez 30 Day Red Flag
30-day New Hire Observations: Yanira Gonzalez - Start date March 20, 2023
Written by: Brenda Fannin on April 23, 2023

Over the past four weeks, Yanira Gonzalez and I have met 3-4 times a week for 15 to 30-minute check-ins. She has completed her 30-day onboarding checklist tasks. Dave and Aizan gave her good initial feedback when we spoke about three weeks ago. Yanira is eager to bring her project management skills to TPG, and, Yanira said she's already added value to the team. I will confirm this during the next 30 days.

In preparation for Yanira's 60-day review, I will review Yanira's deliverables for quality and completeness. I will ask her to be more thoughtful before responding to information because, with me, she rushes to speak before fully understanding the topic. I don't know how this plays out with others, and I realize she may only respond to me this way. Because of this, I will ask her to focus on listening, learning, and being more curious about the current project environment before jumping in to judge or fix without fully understanding all implications, who is involved, their role and position, and their point of view.

On Friday, April 14, 2023, we met for a check-in. I explained the days she is expected to be in the office, such as anchor and staff days. She immediately said she was unavailable for the May anchor day and continued to say *she would quit if there were too many in-office days.* Then *she questioned where I got the information so I could prove it.* I was startled but reminded her about the staff notes and the meetings she attended, where we reviewed the days in the meeting; I said I would work with her the way we did on the five-day vacation she just returned from, and *she said I didn't do her a favor on the vacation because she negotiated that with Jim* before she started. We concluded the call with me still figuring out what was happening during our conversation. I told her I would follow up with an email about the days she needed to come into the office. I ended that call feeling very uneasy. And subsequently, she has confirmed that she can attend all in-office days that hybrid staff members must attend.

On Friday, April 21, 2023, we met for our next check-in, and I asked her to give me feedback on her past 30 days with HBS. She said the onboarding process was fine, and *she still had questions about reporting to me and Aizan.* I explained that it was similar to a service organization, and she cut me off, stating that this was not a service organization because she has worked in service organizations and has experience with them, etc. I listened for a while about various topics that stemmed from that. I finally asked her to consider Aizan as a stakeholder, similar to partner and internal project stakeholders across the school. I explained that she is part of a project management team that manages IT projects across the school. She understood that. Then *she told me Jim called her after she accepted the role to ask her if it was okay if she reported to me and not Aizan.* I explained that the decision was probably made before he called her. *And she disagreed with me; she said she did not think so.*

*I am still unsure exactly what to call all this, but I know her attitude is off-putting and sometimes feels too presumptuous. It causes me to pause and makes me feel defensive, which is my genuine concern during the first 30 days. I told Yanira this.* I explained that I wanted to work with her on this and agreed to tape the next meeting because we both decided it would help us understand why our conversations are so challenging, especially since I believe we both have good intentions.

Jim graciously agreed to have one more meeting with Yanira before he retires to explain how matrixed teams work in SPG. *I am cautiously optimistic that this will be resolved, but I must fully acknowledge this 30-day Red Flag.*

Our next meeting is for 30 minutes on Tuesday, April 25, 2023. We will review the role clarity matrix together.